# CASES DETERMINED

## *January Term, 1891.*

Kountz, Appellant, vs. Gates, Respondent.

*November 28, 1890 — January 13, 1891.*

*(1) Contracts: Consideration: Assignment of mining option. (2) Agency:*
*Sale: Unauthorized surrender of contract: Accounting.*

1. It is a sufficient consideration for the assignment of a mining option
   to a corporation that the stockholders become liable to pay assess-
   ments to develop the property and do pay money for that purpose.
2. An agent to whom property had been conveyed with full power to
   dispose of it in his discretion for the benefit of the principal, and
   who has disposed of the same and secured a contract for the pay-
   ment of a valuable consideration therefor, has no authority, as be-
   tween himself and his principal, to surrender such contract or
   release the purchaser from such payment or any part thereof, where
   there is no controversy as to the binding force of the contract. In
   case of an unauthorized surrender of such contract, the agent must
   account to his principal on the basis of the conditions existing im-
   mediately before such surrender.

APPEAL from the Superior Court of *Milwaukee* County.
The alleged cause of action herein originally accrued to a
corporation known as the " Gates Iron Company," and was
duly assigned by it to the plaintiff before this action was
commenced. The action is in equity for a discovery of the
transactions hereinafter stated, for an accounting, and gen-
eral relief.

In 1886 defendant purchased of Wells & Miner a four-fifths interest in an option to mine for iron ore on certain lands in Michigan, they retaining the remaining one-fifth interest in the option.  October 25th of that year defendant assigned his four-fifths interest in the option to the Gates Iron Company without consideration other than that the company or its stockholders were to expend money to work the option.  The stock of that company was equally divided between its thirteen stockholders, of whom the plaintiff was one, except 5,000 shares retained by the company, from the sale of which a fund for paying expenses was to be raised.  The option had no market value, and its future value was purely speculative and uncertain, because no deposit of iron ore had then been found upon the land covered by it.  After expending some money paid in by the stockholders in unsuccessful explorations for ore, the company became desirous to sell the option, and made efforts to do so, but without success.  Defendant was an officer of the company and participated in these efforts.  On March 21, 1887, for the purpose of enabling defendant to sell or dispose of the option, the company assigned the same to him by a duly executed instrument in writing.  On its face the instrument was an absolute unconditional transfer of the option to the defendant.  He paid no consideration for such assignment.  Soon thereafter defendant entered into negotiations with several persons with reference to a sale or disposition of the option.  These persons were Noyes, Cox, Estee, Mitchell, Rahill, and Corrigan.  The negotiations resulted in an agreement between the defendant and the above-named persons jointly, to the effect that defendant should obtain the one-fifth interest in the option of Wells & Miner; that Noyes, Cox, Estee, and Mitchell should each pay him $1,040; that a new corporation should be organized on the basis of 40,000 shares of capital stock, to which defendant should transfer the option; that the stock thereof

Kountz vs. Gates.

should be divided equally between defendant and the four persons last named; that such stockholders should transfer to Rahill and Corrigan 22,000 shares of the stock of the new corporation and 32,500 shares of the capital stock of another corporation, known as the "United Improvement & Land Syndicate Company;" and that Rahill and Corrigan, in consideration thereof, should convey to them a certain farm in Minnesota, containing 960 acres, and certain personal property thereon, and pay them $11,000 in cash. Defendant was to furnish three fourths of the 32,500 shares of the Syndicate stock, and was to own three fourths of the Minnesota property. Noyes, Cox, Estee, and Mitchell were each to furnish one sixteenth of the Syndicate stock and have a corresponding interest in the Minnesota property.

The foregoing contract was embodied in a written instrument, signed by the defendant and Rahill, which is as follows: "This agreement, made and entered into this 29th day of March, 1887, by and between *James L. Gates*, of Neillsville, Wisconsin, party of the first part, and William J. Rahill, agent, of Cleveland, Ohio, party of the second part, as follows: The party of the first part hereby agrees and binds himself, his heirs and assigns, to sell to said party of the second part thirty-two thousand five hundred (32,500) shares of United Iron & Land Syndicate stock, and further agrees to furnish twenty-two thousand (22,000) shares of stock in the property known as the 'Miner & Wells Option,' being the east half of the southwest quarter, and the west half of the southeast quarter, of section twelve (12), in town forty-seven (47) north, of range forty-six (46), in the state of Michigan, in a stock company based on the said property. For and in consideration of the faithful performance of the above, and the delivery of the said property, the said party of the second part hereby agrees and binds himself, his principal, and his and each of their heirs and assigns, to sell and deliver a certain farm in the state of

Minnesota, described as the east half of section twenty-nine (29), the north half of section twenty-one (21), the northwest quarter of section twenty-nine (29), and the northwest quarter of section twenty-eight (28), in town 154 north, of range forty-seven (47), containing 960 acres of land; together with the appurtenances of said land and farm, including the personal property and the entire inventory as hereto attached, free and clear from any incumbrances of any kind whatever; together with eleven thousand (11,000) dollars cash, to be paid on or before the 15th day of April next. Done in the presence of Jas. B. Estee. JAMES L. GATES. [L. S.]   WM. J. RAHILL, Agt. [L. S.]"

In the execution of this instrument defendant acted for himself, Noyes, Cox, Estee, and Mitchell, and Rahill for himself and Corrigan. A schedule of the personal property referred to in the agreement is attached thereto. The contract is further evidenced by a receipt for a portion of the above stock, signed by " Wm. J. Rahill, Agt.," which refers to the above contract, and contains the following clause: " As soon as 9,979 more shares shall be delivered of same kind of stock (Syndicate), I hereby agree to make and turn over to said *Gates* a good warranty deed of the land, and absolute title to all the personal property therein described, and to deliver the whole of said property to said *Gates*, free and clear from any and all claims whatever, and to date from April 15, 1887."

Soon after such contract was made defendant purchased such one-fifth interest in the option of Wells & Miner, and paid them therefor $500. Noyes, Cox, Estee, and Mitchell each paid him $1,040 in cash, or its equivalent. A new corporation, the Standard Iron Mining Company, was organized as agreed, under the laws of this state, and defendant assigned to it the whole option. The stock thereof (40,000 shares) was issued in equal proportions to the defendant and the four persons last named. Each of the five

stockholders assigned to Rahill and Corrigan one fifth of 22,000 shares of such stock. Defendant purchased three fourths of the 32,500 shares of Syndicate stock, and each of his four associates one sixteenth thereof, and 32,500 shares of Syndicate stock and 22,000 shares of Standard stock were duly assigned and delivered to and accepted by Rahill and Corrigan, and they paid the $11,000, according to the contract, which sum was equally divided between the five original Standard Company stockholders. Afterwards Rahill and Corrigan refused to convey the Minnesota property pursuant to the agreement. This refusal led to further negotiations between the parties to the contract, the result of which was that defendant and his four associates retained the $11,000, Rahill and Corrigan re-assigned the Syndicate stock to the parties from whom they received it, and those parties assigned to Rahill and Corrigan an additional amount of the Standard stock, and released them from their obligation to convey the Minnesota property.

The Syndicate stock which defendant purchased for delivery to Rahill and Corrigan cost him several thousand dollars more than he received in the above transactions, and left him nothing for his expenditure except such Syndicate stock and 1,000 shares of Standard stock, none of which is of any value. The facts were found by the court substantially as above stated.

The complaint alleges that the defendant disposed of the option of the Gates Iron Company (the plaintiff's assignor); that he received upwards of $8,000 therefor, but the plaintiff cannot state the exact amount; and demands an accounting of his transactions in the disposition of the option, and judgment for the amount found due the plaintiff on such accounting. General relief is also demanded.

The answer of defendant denies his alleged agency in disposing of the option, and alleges that the same was absolutely and unconditionally assigned to him free of any

trust.  It also admits, in form, that defendant made an as-
signment of the option to himself, Noyes, Cox, Estee, and
Mitchell, for $5,200, and sets out the contract of which
such assignment was a part, and the subsequent modifica-
tion thereof, substantially as above stated.

In addition to the findings already mentioned, the trial
court found, in substance, that such contract and modifica-
tion thereof constituted one entire, indivisible contract;
that it was within the authority of the defendant to make
the same; that he acted in the matter in good faith; that
he expended a much larger sum in carrying out the same
than he realized from the sale of the option; and that the
only proceeds thereof in his hands were 1,000 shares of
Standard and 24,000 shares of Syndicate stock.

Judgment was thereupon entered for the plaintiff that
the defendant assign and deliver such stock to him, and for
costs.  Plaintiff appeals from the judgment.

For the appellant there was a brief by *Quarles, Spence
& Quarles*, and oral argument by *J. V. Quarles*.

For the respondent there was a brief by *Winkler, Flan-
ders, Smith, Bottum & Vilas*, and oral argument by *E. P.
Vilas*.

LYON, J.  The defendant denied in his answer that any
trust relation existed between himself and the Gates Iron
Company, the assignor of the plaintiff, and alleged that the
assignment, dated March 30, 1887, made by that company
to him, of the four-fifths interest in the Miner & Wells
mining option, was absolute and unconditional, and was
executed pursuant to an understanding with the company
when he assigned the option to it on October 25, 1886, that
if, after prospecting therefor, it failed to find 20,000 tons of
iron ore on the premises covered by the option, it would
reassign the same to him.  Such was defendant's conten-
tion on the trial of the action.  True, the court found that

such assignment of the option to the company was without consideration. This is not quite accurate. Although the assignee paid nothing therefor at the time, yet the stockholders of the company became liable to pay assessments to develop the property covered by the option, and did pay money for that purpose. This was a good consideration for the assignment.

The trial court found that such re-assignment of the option was in trust to enable defendant to dispose of it for the company, and held him liable to account to it for the proceeds thereof. We think the testimony, especially certain letters and telegrams sent by defendant to various officers of the company after the option was re-assigned to him (the contents of which it is unnecessary to state), abundantly support such finding.

We are further of the opinion that the purchase by defendant of Miner & Wells' one-fifth interest in the option, the organization of the Standard Iron Mining Company, and disposition of its stock, and the contracts of defendant with Noyes, Cox, Estee, Mitchell, Rahill, and Corrigan, together constitute a single transaction or deal, each portion of which was essential to a sale or disposition of the option. The court so found, and we think the finding is sustained by the proofs. Also that the defendant had authority to purchase the United Iron & Land Syndicate stock (which, for brevity, will be denominated the Syndicate Stock) to the extent of the moneys received by him for the company in the deal, for the purpose of carrying out the contract with Rahill and Corrigan. But he had no authority to run the company in debt, and hence cannot have a balance certified in his favor in this action because he purchased some of such stock with his own means after exhausting the trust fund in his hands. He did so at his own risk of ultimate loss.

The contracts by which the option in question was disposed of were fully executed by the respective parties

thereto, except the Minnesota property was not conveyed by Rahill and Corrigan as agreed; that is to say, the defendant purchased the outstanding one-fifth interest of Miner & Wells in the option, paying therefor, of his own money, $500. The trial court correctly treated this purchase as having been made for the benefit of the Gates Iron Company. A new corporation (the Standard Company) was organized, to which defendant assigned the whole option. The whole stock of the company (40,000 shares) was issued to defendant and to Noyes, Cox, Estee, and Mitchell in equal proportions. Each of the four last-named persons paid defendant $1,040 — in all $4,160 — in cash or its equivalent. Each of them also purchased one sixteenth of the 32,500 shares of Syndicate stock, and defendant purchased the remainder, or three fourths thereof, for Rahill and Corrigan, paying therefor an average of more than sixty cents per share. Noyes, Cox, Estee, Mitchell, and the defendant each assigned and delivered to Rahill and Corrigan one fifth of 22,000 shares of the Standard stock, and also assigned and delivered to them the 32,500 shares of Syndicate stock thus purchased by them. Rahill and Corrigan thereupon paid the other five parties to the deal $11,000, less an agreed discount of $320, which was equally divided between them, each receiving $2,136. It only required the conveyance by Rahill and Corrigan of the Minnesota property fully to complete the execution of the entire agreement of the parties. At this stage of the transactions the defendant had received on account of the option $6,296, and had paid out $500 for the outstanding one-fifth thereof, leaving in his hands $5,796. He had paid out for the Syndicate stock — 24,375 shares — at least sixty cents per share (as the court found), or $14,625, being $8,829, at least, in excess of the net proceeds of the option received by him. He also held 3,600 shares of Standard stock. Had Rahill and Corrigan conveyed the Minnesota property as they agreed to do, the Gates Min-

ing Company would have become the equitable owner of three fourths of such property, subject to a lien of the defendant thereon for the amount so paid out by him in excess of his net receipts from the sale of the option. It was also the equitable owner of the 3,600 shares of Standard stock thus held by defendant.

But Rahill and Corrigan refused to convey the Minnesota property, and claimed repayment of the $11,000, and offered to re-assign the Standard and Syndicate stocks which they had received in the deal from their associates. The defendant took legal counsel on the subject, and was advised that the agreement could be enforced against them. So far as we can learn from this record the advice was sound. No ground is alleged for repudiating or rescinding the agreement to convey the Minnesota property. It was in writing, duly executed, and the stipulated consideration was expressed therein, and fully paid. Its validity and binding force are not questioned. However, the parties to the agreement entered into negotiations for a so-called compromise, which resulted in a re-assignment by Rahill and Corrigan of the Syndicate stock, an assignment to them of additional Standard stock, of which defendant furnished 2,600 shares, the retention of the $11,000 by the parties to whom it had been distributed, and the release of Rahill and Corrigan from the obligation to convey the Minnesota property. The defendant was a party to this alleged compromise. The Syndicate stock was then declining in value, or rather the price it could be sold for was declining, for it seems never to have had any real value, and at that time its speculative value had probably nearly disappeared. Hence, by the compromise, the defendant released and abandoned a most material and valuable benefit secured by the deal, without the consent or knowledge of his principal. This he had no authority to do. True, he had very ample authority to sell or dispose of the option in his discretion, but after

he had once disposed of it, and secured a valid contract for the payment of a valuable consideration therefor, he was not authorized to release the purchaser from such payment. And this is what the alleged compromise amounts to. There was no basis for a valid compromise, because there was no real controversy as to the binding force of the contract to convey the Minnesota property. It was clearly the duty of the defendant to hold the contract for the benefit of his principal. The principal might have made concessions to avoid a lawsuit; but, the right to a conveyance being clear, the agent, without the consent of his principal, could not lawfully do so. This is but an application of the rule that an agent to sell or otherwise dispose of property for value may not give it away. *Meade v. Brothers*, 28 Wis. 689.

The learned judge of the trial court held, in effect, that it was competent for the agent to enter into the alleged compromise, but for the reasons stated we reach a different conclusion. So far as Rahill and Corrigan are concerned, the compromise is binding upon the Gates Iron Company, because it gave the defendant an absolute assignment of the option, thus enabling him to deal with it as owner, which he did, they having no knowledge that the company was interested therein. But the company or its assignee (the plaintiff) may recover of the defendant what it has lost by reason of the unauthorized surrender of the contract of Rahill and Corrigan to convey the Minnesota property. Story, Ag. (9th ed.), § 217c, and notes. Of course, the measure of such damages is what might have been recovered of Rahill and Corrigan had the surrender not been made, and had an action been brought against them for a breach of their contract to convey. They having refused to convey without any justification or excuse, the recovery against them would be for the value of the contract to the purchaser, which value is measured by the difference between the actual value of the property and the price agreed

to be paid for it.    See 1 Sedg. Dam. (7th ed.), 406, note (*a*). For a full discussion of the rule of damages in such cases, see Id. p. 428.

Rahill and Corrigan agreed to convey the property and pay $11,000 additional for 22,000 shares of Standard and 32,500 shares of Syndicate stock.    For the purpose of determining the contract price for the Minnesota property the Standard stock must be rated as it was by the parties to the deal, which was fifty cents a share, and the Syndicate stock at what it necessarily cost when purchased for delivery to Rahill and Corrigan, which was not less than sixty cents a share.    For convenience of computation we may offset the $11,000 paid by Rahill and Corrigan against the 22,000 shares of Standard stock assigned to them.    This leaves the necessary cost of the Syndicate stock the agreed price of the farm.    Such cost, at sixty cents a share, amounts to $19,500, three fourths of which is $14,625.

The proofs furnished no guide for ascertaining the value of the Minnesota property.    Such property consists of a farm containing 960 acres, and certain personal property thereon.    The description of the personal property is not found in the record.    It is essential to a full determination of the rights and equities of the parties to this action that an account be taken of the actual necessary cost to the defendant of the Syndicate stock purchased by him for Rahill and Corrigan, unless the defendant elect that it be estimated at sixty cents a share, which, the court found, was the price paid by his associates for that purchased by them for the same purpose.    Then the value of three fourths of the Minnesota property, when the contract to convey the same was thus surrendered, should be ascertained by proofs, and if such value exceed the necessary cost of the stock so purchased by defendant, the difference is the measure of compensation for the unauthorized surrender by defendant of the contract for a conveyance of

such property. Should the balance be the other way, it cannot, for reasons already stated, be allowed to the defendant.

Having determined that the defendant, as agent of the Gates Iron Company, was authorized to enter into the deal and make the contracts which resulted in the sale or disposition of the option in question, but was not authorized to surrender Rahill and Corrigan's contract to convey the Minnesota property, it follows that the rights and liabilities of these parties must be determined by the conditions existing immediately before the surrender of such contract. One of these conditions was that the Syndicate stock had then been transferred to Rahill and Corrigan, and the Gates Iron Company thereby ceased to have any interest in it. Its subsequent retransfer to the defendant in execution of his unauthorized agreement with Rahill and Corrigan did not, we think, restore such interest. Hence the judgment herein should not award such stock to the plaintiff. Another condition was that the defendant then held 3,600 shares of the Standard stock, which equitably belonged to the Gates Iron Company. The judgment should award to the plaintiff these 3,600 shares, and if the defendant fail to deliver them, he should be charged with the highest market value thereof between August, 1888 (the date of plaintiff's demand for the proceeds of the option), and the trial.

Briefly to summarize: In stating his account with the Gates Iron Company, the defendant should be charged with the $4,160 received from Noyes, Cox, Estee, and Mitchell, the $2,136 received from Rahill and Corrigan, the value of the contract for the conveyance of a three-fourths interest in the Minnesota property, to be determined on the principles above indicated, and the value of any portion of the 3,600 shares of Standard stock which he fails to transfer to the plaintiff pursuant to the judgment, to be ascer-

tained as before directed. He should be credited with the $500 paid for the outstanding one-fifth interest in the option, and with the actual and necessary cost of the Syndicate stock thus purchased by him for Rahill and Corrigan. The balance, if against the defendant, and the 3,600 shares of Standard stock, is the true measure of plaintiff's recovery in the action.

The only matters to be hereafter litigated are the value of the Minnesota property, the necessary cost of the Syndicate stock, unless the defendant stipulates that it shall be computed at sixty cents a share, and the value of the Standard stock in case the defendant fails to assign to the plaintiff 3,600 shares thereof. All other matters are settled by the findings of the court as herein modified.

*By the Court.*— The judgment of the superior court is reversed, and the cause remanded for further proceedings as herein indicated.